PHILADELPHIA (MURTAGH v.). See Case No. 9,969.

PHILADELPHIA (SUMNER v.). See Case No. 13,611.

PHILADELPHIA, The (THOMPSON v.). See Case No. 13,973.

PHILADELPHIA (VIDAL v.). See Case No. 16,939.

PHILADELPHIA & A. STEAM NAV. CO. v. The DELAWARE. See Case No. 3,763.

---

## Case No. 11,085.

PHILADELPHIA & HAVRE DE GRACE STEAM TOW–BOAT CO. v. PHILADELPHIA, W. & B. R. CO.

[5 Am. Law Reg. (1857) 280.]

District Court, D. Maryland.[1]

MARINE TORTS—ADMIRALTY JURISDICTION—COLLISION WITH PIER—NEGLIGENCE OF CONTRACTOR.

1. The admiralty has jurisdiction over marine torts, which may be defined to be unlawful acts, injurious to others, independent of contract, happening or being committed upon the sea or tide-water.

2. A steam-tug, regularly licensed under the acts of congress, plying between ports in differ-

[1] [Affirmed by circuit court. Case unreported. Decree of circuit court affirmed by supreme court in 23 How. (64 U. S.) 209.]

ent states, is within the provision of the constitution as to the regulation of commerce, and the observance of the special state laws regulating Sunday labor, is not compulsory upon such steam-tug; but it would have been otherwise had the tug been engaged in towing vessels between ports of the same state.

3. Where the respondents had contracted with certain parties for the building of a bridge across the Susquehanna river, and the bridge contractors, at the request and for the convenience of the respondents' engineers, had driven in the bed of the river a "sight-pile," upon which a steam tug-boat run, without fault on her part, and was thereby much damaged, *held*, that the negligence of the contractors and engineers, in not removing the "sight-pile," was the negligence of the respondents, the relation of each master and servant being established by the facts.

[This was a libel by the Philadelphia & Havre de Grace Steam Tow-boat Company against the Philadelphia, Wilmington & Baltimore Railroad Company, to recover damages for an injury alleged to have been sustained by a towboat belonging to the libellants in running against a pile in the Susquehanna river, left in said river by the agents of the respondents.]

Dobbin & Talbot, for libelants.

Schley, Donaldson & Evans, for respondents.

GILES, District Judge. This cause has occupied the attention of the court for several days, and has been fully and ably argued by the several counsel engaged in it; and since the adjournment of the court yesterday, I have examined the various authorities to which I had been referred, and the several cases cited by the counsel; and I will now announce the conclusion to which I have arrived. This is a libel filed by the libellants, (a company incorporated by the state of Pennsylvania, and who are engaged in towing canal boats from the end of the tide water canal, at Havre de Grace, to Philadelphia, through the Chesapeake & Delaware canal,) to recover damages for an injury which the steam tow-boat "Superior" (one of the boats of their line) received from a pile placed in the Susquehanna river by the respondents, or their agents. The evidence showed, that on Sunday morning, the 11th of May, 1856, the said tow-boat left her wharf at Havre de Grace, with thirty-one canal boats in tow, for the Chesapeake & Delaware canal; that she had just got into the stream, and had shaped her course down towards the bay, when she suddenly received a shock, by striking against something in the water, and was found immediately to leak so rapidly that the bilge-pumps could not free her; and that, to prevent her sinking in deep water, the captain immediately cast loose from the canal boats, and run the steamer to the wharf at Havre de Grace, where he had wintered his boat the previous winter, and where she sank in five minutes. That he attached her to the wharf with two ropes and four hawsers, new, and of the strongest kind, but that in the course of an hour and a half, she

snapped these fastenings and slid out into deep water, where she lay until sne was raised, some twenty days after. That she was raised at a cost of $1,567, and sold, unrepaired, at Havre de Grace, for $1,714. A survey was held on her after she was raised, by experienced men, who estimated the costs of repairing her at $2,830, and who recommended that she should be brought to Baltimore to he repaired, as there was no marine-railway at Havre de Grace. That her injury was caused by her running against a pile stuck down in the bed of the Susquehanna river, in the place where vessels usually pass, in twenty feet water, and that the top of the said pile was about five feet below the surface of the water; and there was no buoy or other visible object to indicate its presence. That it was one of the eight piles used by the engineers of the respondents, when laying out the foundations of the bridge they intended to build across the Susquehanna river; that it· had been put down by the contractors for the building of the said bridge, but they did so at the request of the engineer of the respondents, and for their convenience; and the said pile, with the other eight piles, were furnished by the respondents; that the placing or removing of these eight piles formed no part of the contract of the said contractors, and that the piles to which that contract had reference, had been sawed off, or removed previous to this accident. There were some other facts given in evidence, but they were not important, and it is not necessary to recite them here, as those I have presented raise all the questions upon which the case was argued, and are sufficient for the purposes of this opinion.

Four defences have been taken by the respondents to the recovery of the claim of the libellants in this case; three deny any right of recovery at all, and the fourth and last one denies the right of libellants to recover the whole amount of the claim (some $11,000) set forth in their libel.

The first defence taken is, that this court has no jurisdiction of this case, and that if respondents are liable at all, it is only in a court of common law, in an action of trespass on the case. The learned counsel for the respondents contended that the remedy, if a suit had been brought in a court of common law, would be an action on the case, and not trespass; in such a case this court would have no jurisdiction. That the torts of which courts of admiralty have jurisdiction, are those where the agency of man is immediate and direct in their commission, and does not embrace cases where the injury is only consequential. Now, it is laid down in all the elementary writers on admiralty jurisdiction in this country, that in all cases of contract, the jurisdiction of the admiralty court depends upon the subject matter of the contract, and in all cases of torts, the jurisdiction depends upon the locality. And that

over marine torts, the admiralty courts have jurisdiction. I need only refer, for this position, to Conk. Adm. p. 21; Ben. Adm. § 308, and to the case of Waring v. Clarke [5 How. (46 U. S.) 441], which also decided that not only torts "super altum mare (as in England,) but those upon tide-water, "infra corpus comitatus," belong to the jurisdiction of the admiralty courts. Now, what are torts? For a true and concise definition, I refer to the second volume of Bouvier's Institutes, one of the best elementary books we have. On page 491 of that volume, in treating of wrongs, the writer makes this explanation: "Tort, a term of signification somewhat similar to wrong, is an unlawful act, injurious to another, independent of contract. Torts may be committed with force, as a trespass, which may be an injury to the person, such as assault, battery and imprisonment; or they may be committed without force; torts of this latter kind are to the absolute or relative rights of persons, or to personal property in possession or reversion, or to real property corporeal, or incorporeal in possession or reversion; these injuries may be either by nonfeasance, malfeasance or misfeasance." A marine tort, then, is an unlawful act, injurious to another, independent of contract, happening or being committed upon the sea or upon tide-water. Such was, no doubt, the view taken by Judge Grier, in the case of Vantine v. The Lake [Case No. 16,-878]. That was the case of a vessel (the Lake) entering a dock in which a smaller vessel was at that time lying, and which dock contained a rise in the bed of the stream, in which but little water was left at low tide, so that when the tide went out, a vessel lying there would careen over on its side; and that this was known to the consignees of the vessel, who had directed her to be placed in the dock; when the tide went out, the Lake fell over on the smaller vessel and injured it, and for which damages thus caused, the libel was filed. Judge Grier held the Lake responsible, and decreed accordingly. A similar case would be, where a vessel was anchored in the stream, near a port much frequented by vessels, and showed no light or signal at night; and another vessel, in the darkness of night, passing in or out of said port, without any want of care, should run against the anchored vessel, and be thereby injured. The vessel at anchor, and her owners, would certainly be responsible. I have no doubt, therefore, that this court has jurisdiction of the case.

The next defence is, that as this steamer was towing on Sabbath, and the injury was received on that day, there can be no recovery in this case, because said steamer was acting in violation of the law of Maryland, passed in 1723, which, in its 10th section, provided: "That no person whatsoever shall work, or do any bodily labor on the Sabbath day, commonly called Sunday, works of necessity and charity always excepted." The evidence

showed, that the "Superior" was regularly licensed for the coasting trade. There was some evidence that there had been a breach in the tide-water canal, which caused the canal-boats to accumulate at Havre de Grace, and that the Superior was under the necessity of making this trip on Sunday, to relieve this pressure. But in the view of this court, that is not such a work of necessity as would bring the case within the exception of the act of 1723. The libellants had the monopoly of this towing business between Havre de Grace and Philadelphia, and were bound to look to all the contingencies of the service, and provide boats sufficient for it. The question then remains, was the "Superior" amenable to this act, and bound to obey its provisions? To solve this question truly, we must first see what her license authorized her to do, and what force and effect that license had, when coming in conflict with a law of this state. It is perfectly clear, that if this boat had been engaged in the domestic commerce of this state, towing barges or boats from the eastern shore to Baltimore, or from Havre de Grace to Baltimore, the provisions of this law would have been obligatory upon her. But by the 8th section of article 1 of the constitution of the United States, the power "to regulate commerce with foreign nations, and among the several states and with the Indian tribes," is given to congress. This power is an exclusive power; and no act of a state, which in any way would seek to regulate, restrain or limit foreign commerce, or the commerce between the states, can be of any binding effect, except it be adopted by, or otherwise receives the sanction of congress. This principle was decided in the case of Gibbons v. Ogden, 9 Wheat. [22 U. S.] 1. That case also decided, that the power given to congress to regulate commerce, extends to vessels propelled by steam, as well as those navigated by the instrumentality of wind and sails; and also, that a license under the acts of congress for regulating the coasting trade, gives a permission to carry on that trade. The opinion in that case was delivered by Chief Justice Marshall. This was in 1824. But, recently, this question has been again brought before the supreme court, and was there very fully argued, and received the careful examination of that learned tribunal. I allude to the Passenger Cases decided in 1849, and reported in 7 How. [48 U. S.]. The cases commence on page 283 of that report, and embrace two hundred and ninety pages, nearly one-third of the volume. The judges gave their opinions seriatim, but Justices McLean, Catron, McKinley, Wayne and Grier, united in the opinion, that the laws of Massachusetts and New York, brought up to review in those cases, were void, as they were regulations of foreign commerce, and therefore beyond the constitutional powers of the states. I can only here make two short extracts from these able opinions. On page 400, Judge Mc-

Lean announces the conclusion to which he arrived, in the following language: "Whether I consider the nature and object of the commercial power, the class of powers with which it is placed, the decision of the court in the case of Gibbons v. Ogden [supra], reiterated in Brown v. Maryland [12 Wheat. (25 U. S.) 419], and afterwards re-asserted by Mr. Justice Story, who participated in those decisions, I am brought to the conclusion, that the power 'to regulate commerce with foreign nations, and among the several states,' by the constitution, is exclusively vested in congress." And on page 414, Judge Wayne, in announcing the conclusion to which he and a majority of the court had arrived upon this most important question, says: "That the power in congress to regulate commerce with foreign nations, and among the several states, includes navigation upon the high seas, and in the bays, harbors, lakes and navigable waters within the United States, and that any law by a state, in any way affecting the right of navigation, or subjecting the exercise of the right to a condition, is contrary to the aforesaid grant." Now, it must be admitted, that if this law of Maryland, for the observance of the Sabbath, can be made applicable to vessels engaged in the commerce between the states, then they are made subject to a regulation which congress never authorized or sanctioned. Under her license, what were the rules and regulations by which this vessel was bound, and under which she was authorized to sail? These regulations will be found in Act Sept. 1, 1789, § 22 [1 Stat. 60], and in the second and third sections of Act March 2, 1819 [3 Stat. 493]. But there is no provision in these, or in any other acts of congress, that she should not sail on Sunday. I consider, therefore, that the steamer of the libellants was not bound to obey the law of Maryland, to which reference has been made, and that there is no valid objection to the recovery of the libellants for the damages they have suffered on that ground. Reference has been made, in the course of the argument, to the quarantine and pilot laws of the several states, which we recognized as valid and binding upon the commerce of the country. But an examination of the acts of congress, will show that they have been sanctioned and adopted by congress. By the 4th section of the act of August 7, 1789 [1 Stat. 54], it is enacted: "That all pilots in the bays, &c., of the United States, shall continue to be regulated in conformity with the existing laws of the states, respectively, in which such pilots may be, &c., &c., until further legislation shall be made by congress." And by the act of February 25, 1799 [Id. 619], the quarantine and health laws of the several states were sanctioned and approved.

The next objection taken to the recovery of this claim by libellants is, that the contractors for building the bridge are the re-

sponsible parties, and not the respondents. And in the argument of this point, I was referred to some twelve English decisions, and three American cases. I have examined these cases, and according to the view I take of the facts of this case, I do not deem them applicable. The law they lay down is not disputed by the libellants' counsel, nor could it be controverted in a case where similar questions might arise. In nearly all of them the question was, whether the party committing the tort was the servant of the defendants, or whether he was not the servant or agent of another party, acting under an independent contract. Of this character are the cases of Rapson v. Cubitt, reported in 9 Mees. & W. 709; Reedie v. London & N. W. Ry. Co., reported in 4 Exch. 244; Knight v. Fox, 5 Exch. 721; Quarman v. Burnett, 6 Mees. & W. 499; and the late case of Steel v. Southeastern Ry. Co., 32 Eng. Law & Eq. 366. In all these cases, except Quarman v. Burnett, the work from which the injury resulted had been performed by the employee of one who had a contract for the execution of said work. Quarman v. Burnett was the case of an owner of a carriage hiring horses of a job-man, who provided a driver; and the owner of the carriage was held not responsible for an injury caused by the carelessness of the driver. The case of Milligan v. Wedge, 12 Adol. & E. 737, was the case of a butcher who had employed a licensed drover to drive him a bullock he had bought at market, and the drover's boy, by his negligence, suffered the bullock to run into the plaintiff's show-room, where he did considerable damage. It was held that the owner of the bullock was not responsible. The three American cases to which I have been referred are Blake v. Ferris, in 1 Seld. [5 N. Y.] 48; Mayor, etc., of New York v. Bailey, 2 Denio, 434; and Lowell v. Boston & L. R. Corp., 23 Pick. 24. These cases maintain the same principle upon which the English cases were decided. And in the cases in Denio and Pickering, the defendants were held responsible, on the ground that a party is responsible for an injury resulting from the negligence and unskillfulness of his servants or agents. See the very late case of Hilliard v. Richardson, 3 Gray, 354.

Now, the evidence in this case, in my opinion, clearly shows that the steamer was injured by running upon a sight-pile, which had been placed in the river by the direction and for the use and convenience of the engineers of the respondents, and was not placed there by the contractor, in the execution of his contract for building the bridge. It was clearly, therefore, the negligence of the engineers in not removing this pile, when they had ceased to use it; and for the injury resulting from this negligence of their agents, I think the respondents are answerable. The only question remaining, is the amount of damages to which the libellants

are entitled. The rule of damages which has been laid down by the supreme court in collision cases, seems to me to be a just one in this case. I refer to the case of Williamson v. Barnett, 13 How. [54 U. S.] 101. I shall allow the libellants the following items: Furniture lost, $500.00; cost of raising steamer, $1,567.36; net earning for 60 days, which it would take to raise and repair her, $1,890.00; necessary repairs, to place her in as good a condition as before the accident, $2,890.00; cost of taking her to Baltimore, estimated at $153.00,—$7,000.36. For which sum I will sign a decree. I do not think that, under all the circumstances, the libellants were justified in selling her at Havre de Grace; and I therefore decline to allow them the amount claimed by them, growing out of that sale, and the small amount realized from it. I think her leak might have been stopped, so far as to have enabled the libellants to bring her round to Baltimore, where she could be taken upon the railway and repaired; and the intelligent gentlemen who examined her at the request of the libellants, recommended this course, and gave it as their opinion, that there would be but little risk in bringing her to Baltimore.

[An appeal was taken to the circuit court, where the decree of this court was affirmed. Case unreported. An appeal was then taken to the supreme court, where the decree of the circuit court was affirmed, with costs. 23 How. (64 U. S.) 209.]